IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| IN RE: ) | |
| JOHN BRUCE WILSON SEPARATE ) | |
| PROPERTY TRUST ) | |
| ) | |
| DEBORAH LAVERNE FRENCH, ) | |
| MEREDITH EMILY WILSON LOUNGE, ) | Case No. 3:15-0520 |
| VALERIE DAWN KEATING, ) | |
| ) | |
| v. ) | |
| ) | |
| BENNETT GORDON SCOTT WILSON, ) | |
| Successor Co-Trustee and as the Conservator ) | |
| of JOHN BRUCE WILSON, JR., ) | |
| Successor Co-Trustee ) | |

To:     The Honorable Aleta A. Trauger, District Judge

# REPORT AND RECOMMENDATION

Pending before the court are Plaintiffs' Motion to Enforce Arbitration Order #2 (Docket No. 117), Motion of Defendant Bennett Gordon Scott Wilson to Vacate Arbitration Order #2 (Docket No. 140), and Motion of Defendant John Bruce Wilson, Jr. to Vacate Arbitration Order #2 (Docket No. 145). These matters were referred to the magistrate judge for report and recommendation. *See* Order at Docket No. 125. For the reasons that follow, it is recommended that Plaintiffs' motion be DENIED as to the enforceability of an arbitration award and also DENIED, on different grounds, as to enforcement of the settlement agreement. Denial of Plaintiffs' motion as to the enforceability of an arbitration award renders Defendants' motions moot, and recommendation is therefore made that Defendants' motions be DENIED AS MOOT.

**Background**

The procedural history of this case is a long and tortured one, some of which is recited in earlier orders of the court determining applicable law (see Docket No. 51) and granting Plaintiffs' request for a preliminary injunction (see Docket No. 66). The following is the history necessary for disposition of the pending motions.

This action arises out of a dispute among family members over administration of the John Bruce Wilson Separate Property Trust ("the Trust"). Plaintiffs and Defendants are siblings, all children of John Bruce Wilson, Sr. Plaintiffs allege in their Amended Complaint for Declaratory Judgment and Breach of Trust (Docket No. 53) that Defendant Scott Wilson has breached his fiduciary duties as Co-Trustee and they seek damages from both Defendants.

There is no dispute that the Trust was created by John Bruce Wilson, Sr., on May 2, 2000. The Trust consisted primarily of parcels of real property, which Mr. Wilson conveyed to the Trust. (Docket No. 53-1 at 27-28). On the same date that the Trust was created, Mr. Wilson also executed an Amendment to the Trust with additional provisions regarding distributions (some of which are in dispute). (Docket No. 53-2). The parties also agree that, as a result of the incapacity and disability of Defendant John Wilson Bruce, Jr., Defendant Scott Wilson was appointed conservator over his brother's person and property. The order of the Chancery Court for Montgomery County, Tennessee, finding John Bruce Wilson, Jr., in need of a conservator was entered on August 8, 2014. (Docket No. 142-2). John Bruce Wilson, Sr. died on September 9, 2014.

Plaintiffs filed their original complaint on May 5, 2015 (Docket No. 1), and an amended complaint on January 7, 2016 (Docket No. 53). Both Scott Wilson and John Bruce Wilson, Jr. were named as defendants. (Docket No. 53 at ¶¶ 5-6). Initially, counsel appeared only on behalf of Scott Wilson. (Docket No. 9). Later, new counsel entered appearance for both Defendants. (Docket Nos. 27 and 28).

On July 6, 2016, Plaintiffs Deborah French and Meredith Lounge and Defendants participated in private mediation with James D. Kay, Jr.[1] According to Mr. Kay, the parties signed an agreement to mediate. (Docket No. 115 at ¶1). By Mr. Kay's own description, "[t]he mediation was extremely complex, difficult and stressful" for all of the parties involved and for Mr. Kay. (*Id*. at ¶5).[2] At the end of the mediation, settlement term sheets were signed by Plaintiffs French and Lounge, but not by Scott Wilson or John Wilson, although it appears that their counsel signed the term sheets. (Docket No. 115 at ¶7 and Ex. 2).[3] Following mediation, counsel for the parties were to negotiate a settlement agreement based on the mediated settlement terms.

The draft settlement agreement contained a number of provisions about which Scott Wilson raised issues. *See* Docket No. 115-3 at 2-3. Some of the issues raised specifically addressed terms recited in the term sheet, while others were matters not in the term sheet. Neither the term sheets nor the draft settlement agreement include any provision for the Chancery Court supervising John Wilson's conservatorship to review the settlement and determine if it is in his best interests. (Docket Nos. 115-2 and 115-6).[4]

On August 19, 2016, Plaintiffs filed a Motion to Enter Final Order Incorporating Terms of Settlement Agreement (Docket No. 96).[5] In their supporting memorandum, Plaintiffs stated that

---

[1] Plaintiff Valerie Keating apparently did not participate in the mediation, and instead appeared to have given her sisters some sort of proxy. *See* Docket No. 115-5 at 3.

[2] Mr. Kay's statements are found in a filing titled "Arbitration Order #2" (Docket No. 115), issued by Mr. Kay ostensibly in his capacity as an arbitrator.

[3] As discussed in more detail below, Plaintiffs' original motion for entry of a final order incorporating the settlement terms was not at all clear as to who signed the settlement term sheets, and the attached term sheets included illegible signatures. *See* Docket No. 96-1. Contrary to the actual events, Plaintiffs' motion left the impression that the term sheets were signed by Defendants. *See* Docket No. 96 at ¶3.

[4] The draft settlement agreement does provide for Scott Wilson to seek approval of the Chancery Court for the self-settled trust provided for in the settlement agreement to receive the distributions due to John Wilson.

[5] Plaintiffs also requested attorneys' fees.

3

the parties "*orally agreed* that mediator Jim Kay would act as final binding Arbitrator over any disputes related to [the] details" of the final settlement agreement, and also stated that the disputes were presented to Mr. Kay "[p]ursuant to the parties' *oral agreement*." (Docket No. 97 at 3) (emphasis added).[6] Defendant Scott Wilson filed a pro se response in opposition to Plaintiffs' motion on September 2, 2016. (Docket No. 98).[7] In his response, Scott Wilson contended that he did not sign the term sheet resulting from the mediation. He also contended that the draft of a formal settlement agreement failed to include material terms that were negotiated by the parties and included other terms that were not agreed to.

Because it was not clear whether Scott Wilson had signed the term sheet, and there otherwise appeared to be a genuine dispute about the settlement terms, the parties' disagreement was referred back to Mr. Kay for further mediation. *See* Order entered on September 26, 2016 at Docket No. 104. On September 29, 2016, all counsel of record (including Defendants' counsel, who were still counsel of record at that time), together with Scott Wilson and John Wilson participated in a conference call with Mr. Kay, during which the parties were asked by Mr. Kay to "submit a position statement." (Docket No. 115 at ¶12).[8]

Following the conference call on September 29, 2016, Mr. Kay signed "Arbitration Order #1." (Docket No. 115-4). He noted that counsel for John Wilson and Scott Wilson had filed motions for leave to withdraw, and Mr. Kay gave Scott Wilson until October 5, 2016 to file "his

---

[6] Mr. Kay also acknowledged in Arbitration Order #2 that there was no written arbitration agreement. (Docket No. 115 at ¶8).

[7] Scott Wilson's response was filed pro se, even though he was represented by counsel at the time. Shortly after Scott Wilson's filing of a pro se response, his counsel moved to withdraw (Docket No. 101), which they were permitted to do. *See* Order entered on November 1, 2016 at Docket No. 109.

[8] The statements are attached as Exhibit 4 to Mr. Kay's "Arbitration Order #2." (Docket No. 115-4).

4

suggestions for the procedure that should be followed in this arbitration" and directed Plaintiffs to do the same. (Docket No. 115-4 at 1). Mr. Kay also directed that submissions be served on everyone except John Wilson, because John Wilson's interest was "protected by his brother Scott Wilson." (*Id*.) Mr. Kay stated that, upon receipt of the parties' submissions, he would "determine the scope of the arbitration proceeding." (*Id*.)

On October 5, 2016, Scott Wilson sent Mr. Kay his submission in which he asked for more time to hire an attorney, expressed his concern that his brother, John, did not have independent counsel, and asserted that his brother's interests were not protected during the mediation. (Docket No. 114-4 at 4). Scott Wilson also requested an arbitration hearing once he retained new counsel. (Id.). Plaintiffs' counsel also requested a hearing "as soon as possible" and described the issues they intended to be included within the scope of the proceeding. (*Id*. at 3).

Apparently after consideration of the parties' submissions, but without a hearing, Mr. Kay signed "Arbitration Order #2"on November 7, 2016, in which he stated that, at the conclusion of the first mediation, he asked "all counsel and all parties" if "they wanted [him] to serve as arbitrator in the event that there was a dispute regarding any matters related to the wording of a settlement agreement and final order" and that "[a]ll counsel and all parties consented and agreed that [the final settlement agreement and order] were subject to binding arbitration before [him.]" (Docket No. 115 at ¶8). However, the agreement to arbitration was not in writing. (*Id*.). Mr. McKay further "explained to Scott Wilson and John Wilson that [he] would become the arbitrator of the settlement agreement and that the findings would be binding," after which, according to Mr. Kay, "[b]oth Scott and John Wilson looked [him] in the eye and stated they agreed to the same." (*Id*.) The final provision in Mr. Kay's "Arbitration Order #2" stated:

> 14.     Scott Wilson and John Wilson apparently have not obtained new counsel but the undersigned believes that their failure to do so has no bearing and will have

5

> no bearing on this ruling. Simply put, the parties agreed to a settlement. their (sic) counsel signed for them and Scott and John Wilson agreed to the deal. Secondly, the parties agreed to have the undersigned serve as the arbitrator of any disputes regarding the wording of the settlement document. Third, the undersigned finds no reason whatsoever to change the ruling from August 12, 2016 as no facts have changed or been submitted in support of a change. Mr. Scott Wilson, personally and on behalf of his brother, agreed to the settlement and apparently he has changed his mind. This does not constitute a legitimate ground to not proceed with the settlement.
>
> Consequently it is the opinion of the undersigned that the parties shall sign the Settlement Agreement of July 6, 2016 (Ex. 6).
>
> It is so ordered.

(Docket Entry 115 at ¶14)

On November 22, 2016, Plaintiffs filed the instant motion to enforce Arbitration Order #2. (Docket No. 117). Although captioned as a motion to enforce an arbitration order, the stated relief sought is entry of an order adopting and incorporating by reference the terms of the settlement agreement as the final order of the court upon compromise and settlement, with retention of jurisdiction to enforce the terms of a final order incorporating the terms of the detailed, formal Settlement Agreement. The motion also requests that Scott Wilson be compelled to provide an accounting of Trust assets, income, and distributions from July 6, 2016 forward and to pay Mr. Kay's fees and expenses incurred in connection with this matter after July 6, 2016. Plaintiffs' further request their own attorneys' fees and expenses incurred post-mediation and related to or associated with Plaintiffs' efforts to enforce the terms of the mediated settlement agreement, and other general relief.

To allow for participation by new counsel, including by separate counsel for John Wilson (see Docket Nos. 131 and 132), Scott Wilson and John Wilson were given additional time to respond to Plaintiffs' motion, and each filed a response in opposition. (Docket Nos. 137 and 141). On January 27, 2017, Scott Wilson filed the pending motion to vacate Arbitration Order #2.

(Docket No. 140). On February 7, 2017, John Wilson filed his motion to vacate Arbitration Order #2, which also remains pending. (Docket No. 145).

**Analysis**

In their Motion to Enforce Arbitration Order #2, Plaintiffs request enforcement of the referenced arbitration order, which Plaintiffs assert was entered by Mr. Kay in accordance with the parties' purported agreement to binding arbitration.[9] However, other than contending that the parties agreed to binding arbitration by Mr. Kay, Plaintiffs do not cite specific authority supporting confirmation of a binding arbitration award, and the court is not at liberty to discern supporting authority for Plaintiffs' cause—that task is Plaintiffs' alone. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones." (quotation omitted)); *see also* L.R. 7.01(b) (requiring parties to cite supporting legal authority for requested relief).

In both motions, Plaintiffs essentially seek to enforce the draft settlement agreement under general principles of contract formation. Notwithstanding Plaintiffs' bare bones argument, Defendant John Wilson asserts in his response that the absence of a written arbitration agreement precludes the relief requested by Plaintiffs under both federal law and Tennessee law. *See* Docket

---

[9] In the earlier-filed memorandum in support of their first motion for entry of a final order incorporating the terms of the settlement agreement (Docket No. 97), Plaintiffs stated that the parties "*orally agreed* that mediator Jim Kay would act as final binding Arbitrator over any disputes related to [the] details" of the final settlement agreement, and also stated that the disputes were presented to Mr. Kay "[p]ursuant to the parties' *oral agreement*." (Docket No. 97 at 3) (emphasis added). That memorandum similarly omitted any supporting authority for Plaintiff's specific request of confirmation of an arbitration award.

No. 141.  Defendant Scott Wilson similarly argues that Tennessee law requires a written arbitration agreement.  *See* Docket No. 137.[10]  In reply, Plaintiffs argue that, under Tennessee law, there is an enforceable arbitration agreement among the parties.[11]  To address this issue, which is preliminary to the issue of enforceability of the settlement agreement, it is necessary to determine whether the procedure in which the parties engaged regarding disputes about the settlement terms was binding arbitration or something else.

### **Not a binding arbitration process**

Notably, Plaintiffs' first motion for entry of a final order incorporating the terms of the settlement agreement did not expressly seek confirmation of a binding arbitration award.  (Docket No. 96).  Had they done so, this case might not necessarily have proceeded any more smoothly, but it would at least have proceeded more clearly.

When the court's order of September 2, 2016 (Docket No. 99) afforded the magistrate judge discretion to refer the parties' dispute over settlement terms back to the mediator, Plaintiffs did not seek clarification of the scope of the permitted referral; that is, whether it was to be for further mediation, for nonbinding or binding arbitration, or for some other procedure.[12]  Nor did

---

[10] Defendants also assert this and other grounds as the bases for their respective motions to vacate "Arbitration Order #2."  *See* Docket Nos. 140 and 145.

[11] Defendant John Bruce argues that Arbitration Order #2 is unenforceable under both the Tennessee Uniform Arbitration Act and the Federal Arbitration Act.  However, Plaintiffs did not assert in their reply that the Federal Arbitration Act applies.

[12] Local Rule 16.01(d)(2) through (8) sets forth procedures for court-annexed alternative dispute resolution, including nonbinding arbitration.  L.R. 16.07.  The goal of court-annexed dispute resolution is to assist the parties in reaching voluntary settlements.  *See* L.R. 16.02(b).  To that end, Local Rule 16.03 defines "nonbinding arbitration" as "a process in which an ADR neutral … considers the facts and arguments presented by the parties and renders a written decision that is nonbinding."  L.R. 16.03(a)(4).

8

Plaintiffs seek any such clarification of the order entered by the undersigned on September 26, 2016 (Docket No. 104) referring the dispute back to the mediator. To the extent that Plaintiffs rely on the September 26, 2016 order as referring the issues back to Mr. Kay for binding arbitration, that reliance is misplaced. Indeed, the undersigned understood the context of Plaintiffs' first motion to be a request for enforcement of a settlement agreement, essentially for specific performance. That understanding is consistent with the way in which Plaintiffs' framed their first motion for relief.

If, in their first motion, Plaintiffs were seeking confirmation of a binding arbitration order directing Defendants to execute the settlement agreement, that is plainly a much more limited review and a very different analysis than the contract formation arguments made by Plaintiffs. Similarly, although the instant motion is captioned as motion to enforce an arbitration order, Plaintiffs still do not address the limited judicial review of a binding arbitration award. It is therefore reasonable to conclude that, notwithstanding descriptions to the contrary, the assistance provided by Mr. Kay in resolving issues about the details of a final settlement agreement was not binding arbitration.[13]

This conclusion is bolstered by the court's inability to find that the parties agreed to binding arbitration. The Arbitration Act expressly requires that agreements to arbitrate be in writing, either "[a] written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy thereafter arising between parties." Tenn. Code Ann. § 29-5-302(a). This requirement of a written arbitration agreement has been consistently

---

[13] Although Defendants' arguments are framed as the reasons why any binding arbitration award by Mr. Kay must be vacated, those same arguments support the determination that the post-July 6 process in which the parties and Mr. Kay engaged was something other than binding arbitration.

described by Tennessee courts as a statutory safeguard intended to ensure that parties consent to the finality of binding arbitration. *See e.g. T.R. Mils Contractors, Inc. v. WRH Enterprises, LLC*, 93 S.W.3d 861, 869 (Tenn.Ct.App. 2002); *Smith v. Smith*, 989 S.W.2d 346, 348 (Tenn.Ct.App. 1998); *Fontaine v. Weekly Homes, L.P.*, 2003 WL 21946721, at *1 (Tenn.Ct.App. Aug. 13, 2003); and, *Blount Excavating, Inc. v Denso Mfg. Tennessee, Inc.*, 1998 WL 1068678, *5 (Tenn.Ct.App. Nov. 29, 1999).

Until Defendants opposed Plaintiffs' request for confirmation of Arbitration Order #2, the absence of a written arbitration agreement was not disputed. In their Memorandum in support of their motion to enter final order incorporating terms of settlement agreement, Plaintiffs affirmatively stated that the parties "*orally agreed* that mediator Jim Kay would act as final binding Arbitrator over any disputes related to [the] details" of the final settlement agreement, and also stated that the disputes were presented to Mr. Kay "[p]ursuant to the parties' *oral agreement*." (Docket No. 97 at 3) (emphasis added). Mr. Kay himself acknowledged in Arbitration Order #2 that there was no written arbitration agreement. (Docket No. 115 at ¶8). Even though Plaintiffs' have filed two separate motions essentially requesting that the court confirm arbitration decisions of Mr. Kay, Plaintiffs did not address the existence or sufficiency of a written arbitration agreement in either their motion seeking entry of an order incorporating the mediated settlement terms (Docket No. 97) or in their motion to enforce Arbitration Order #2 (Docket No. 117).

For the first time in their reply to Defendants' responses in opposition to the motion to enforce Arbitration Order #2, Plaintiffs argue that a written arbitration agreement was authenticated under the Tennessee Uniform Electronic Transactions Act (the "UETA"), specifically Tenn. Code Ann. § 47-10-107, by emails among the parties' counsel and Mr. Kay. (Docket No. 115-3 at 1-3). A reply brief is not the proper place to raise an issue for the first time. Arguments raised for the first time in a reply brief are generally not considered. *G.C. ex rel*

10

*Johnson v. Wyndham Hotels and Resorts*, LLC, 829 F.Supp.2d 609, 613 (M.D. Tenn. 2011) (citation omitted).

Nevertheless, the undersigned has considered Plaintiffs' arguments that a written arbitration agreement exists. Enforcement of arbitration agreements is favored by legislative policy. *Buraczynski v.Eyring*, 919 S.W.2d 314, 318-19 (Tenn. 1996). "It is the responsibility of the courts to give as broad a construction to an arbitration agreement as the words and intentions of the parties, drawn from their expressions, will warrant, and to resolve any doubts in favor of arbitration." *Wachtel v. Shoney's, Inc.,* 830 S.W.2d 905, 908 (Tenn.Ct.App.1991). Even applying such broad construction, the procedure at issue here does not constitute an arbitration under the Arbitration Act.

Essentially, Plaintiffs request that the court cobble together a series of emails among the parties' counsel of record at the time and Mr. Kay regarding disagreements over the terms of the formal settlement agreement to construct a written arbitration agreement of some kind. In doing so, the court must keep in mind that the requirement of a written arbitration agreement is a necessary safeguard. In the court's opinion, when the party asserting the existence of a written arbitration agreement must resort to the lengths to which Plaintiffs go here, the safeguard fails. The *Waddle v. Elrod* case upon which Plaintiffs rely does not compel a different result. 367 S.W.3d 217 (Tenn. 2012).

In *Waddle*, a dispute arose in connection with Earline Waddle's contracted sale of property to a third-party because one-half of her interest in the property had been quitclaimed to her niece, Lorene Elrod, which Ms. Waddle alleged was acquired through undue influence. When sued by the buyer, Ms. Waddle filed a cross-claim against Ms. Elrod to set aside the quitclaim. Ms. Waddle and Ms. Elrod reached a settlement, which was expressly confirmed by Ms. Elrod's attorney in an

email confirming the agreement. Approximately three weeks later, after exchange of settlement documents, Ms. Elrod advised her attorney that she had changed her mind and no longer wanted to settle the case. The trial court granted Ms. Waddle's motion to enforce the settlement agreement. Unlike the instant dispute, Ms. Elrod did not challenge on appeal the trial court's finding that the parties had reached an agreement to settle the case; she argued instead that the Statute of Frauds precluded enforcement of the settlement agreement. The issues on appeal were whether the Statute of Frauds applies to a settlement agreement that requires the transfer of an interest in real property, which the Tennessee Supreme Court held it did.

In considering whether the Statute of Frauds barred enforcement of the settlement agreement at issue, the *Waddle* court expressly noted that "the Statute of Frauds does not require a written contract, only a written memorandum or note evidencing the parties' agreement." 367 S.W.3d at 226 (citation omitted). In contrast, the Arbitration Act specifically requires a written agreement or contract.[14] Because there was no written agreement among the parties for binding arbitration, the procedure at issue here fails to rise to the level of an arbitration under the Arbitration Act from which an enforceable award issued. Thus, Plaintiffs' motion for enforcement of Arbitration Order #2 should be denied on that ground. Because the court finds that there was no arbitration process from which an arbitration award properly issued, Defendants' motions to vacate Arbitration Order #2 are rendered moot, and it is therefore unnecessary to address the issues

---

[14] Further, the court is not entirely convinced that the settlement of this family dispute over the administration of a probate estate is a transaction within the meaning of the UETA. The UETA only applies to certain transactions, which are defined as "an action or set of actions occurring between two (2) or more persons relating to the conduct of *business, commercial, or governmental affairs*." Tenn. Code Ann. § 47-10-102(16) (emphasis added). While *Waddle* also involved a disagreement between family members, the circumstances here are very different from those in *Waddle*. Plaintiffs offer no guidance on the scope of the UETA.

12

raised in those motions. Accordingly, Defendants' motions to vacate Arbitration Order #2 should be denied as moot.

### **Enforceability of Settlement Agreement**

Despite the absence of an enforceable binding arbitration order, the court nevertheless finds it appropriate to consider the substance of Plaintiffs' request, namely enforcement of the settlement agreement.[15] A district court has the inherent power to enforce a settlement agreement between parties in litigation. *Bamerliease Capital Corp. v. Nearburg*, 958 F.2d 150, 152 (6th Cir. 1992); *Brock v. Scheuner Corp.*, 841 F.2d 151, 154 (6th Cir. 1988). A court can exercise this power "even if that agreement has not been reduced to writing." *Bowater N. Am. Corp. v. Murray Mach.*, 773 F.2d 71, 77 (6th Cir. 1985). The power of a trial court to enforce a settlement agreement "has its basis in the policy favoring the settlement of disputes and the avoidance of costly and time-consuming litigation." *Kukla v. National Distillers Products Co.,* 483 F.2d 619, 621 (6th Cir.1973).

In applying these principles, the Sixth Circuit has cautioned that

> [w]hile summary enforcement of a settlement agreement may very well promote the above policy in cases where there exists no substantial dispute as to the entry into, or the terms of, the agreement, summary proceedings may result in inequities when ... such a dispute does exist.

*Id.* at 621 (citations omitted). Thus, "[b]efore enforcing settlement, the district court must conclude that agreement has been reached on all material terms." *Brock,* 841 F.2d at 154. *See also* <u>Therma-</u>

---

[15] To be clear, Plaintiffs' request for enforcement is premised on the assumption that Mr. Kay's direction for Defendants to sign the settlement agreement is an enforceable arbitration order. For the reasons stated, the court declines to enforce the settlement agreement on that ground. Nevertheless, the court can still consider whether the settlement agreement constitutes an enforceable contract under ordinary principles of contract formation, which is essentially the argument made in Plaintiffs' two motions anyway.

13

*Scan, Inc. v. Thermoscan, Inc.*, 217 F.3d 414, 419 (6th Cir. 2000). The court must also enforce the settlement as agreed to by the parties, and is not permitted to alter the terms of the agreement. *Brock*, 841 F.2d at 154 (citations omitted).

"Whether the parties actually reached an agreement is a question of fact for the district court," *Moore v. U.S. Postal Serv.*, 369 Fed.Appx. 712, 717 (6th Cir. 2010), which is governed by state contract law, *Cuyahoga Valley Ry. Co. v. U.S. Bank Trust Nat'l Ass'n*, 515 Fed.Appx. 494, 498 (6th Cir. 2013) ("Because settlement agreements are a type of contract, the formation and enforceability of a purported settlement agreement are governed by state contract law."). It is well established in Tennessee that, in order to be enforceable, a contract must represent mutual assent to its terms, be supported by sufficient consideration, be free from fraud and undue influence, be sufficiently definite, and must not be contrary to public policy. *Johnson v. Central Nat'l Ins. Co.*, 210 Tenn. 24, 356 S.W.2d 277, 281 (1961). Such a contract can be expressed or implied, written or oral. *Id.* What is critical is a meeting of the minds, mutual assent to be bound. A meeting of the minds is judged by an objective standard, looking to the express words of the parties and their visible acts, not their subjective states of mind. *Gurley v. King*, 183 S.W.3d 30, 43 (Tenn. Ct. App. 2005).

Here, the court finds that an agreement about some terms was reached during mediation. That is clear from the filed mediator's report (Docket No. 89) and the signed settlement terms. It makes no difference that Defendants did not sign the term sheet, as there is no dispute that it was signed by Defendants' counsel of record at the time, and is therefore binding on Defendants. *Moore v. U.S. Postal Service*, 369 F. App'x 712, 718 (6th Cir. 2010). But that does not resolve the dispute. The court must still inquire whether there was mutual assent to all material terms, as

14

presented in the draft settlement agreement that Plaintiffs seek to enforce. Based on the record, the parties did not reach a meeting of the minds regarding all material terms.

That there was no meeting of the minds as to all material terms is perhaps best exemplified by the fact that two different settlement agreements have been presented by Plaintiffs as the final settlement agreement. On August 19, 2016, Plaintiffs' motion seeking entry of a final order incorporating terms of the settlement included an attached Exhibit B (Docket No. 96-2), represented as the settlement agreement purportedly agreed by the parties. Later, on February 16, 2017, Plaintiffs filed a "substituted Exhibit B". *See* Notice of Filing at Docket No. 147.[16] No explanation was offered for the different filings.[17]

Additionally, almost everything about Defendants' objective acts after the July 6, 2016 mediation reflected a belief that they had not reached a settlement agreement, including the August 11, 2016 email from Defendants' counsel that Defendant Scott Wilson was not in agreement with the draft settlement agreement. (Docket No. 115-3 at 2-3). From that point on, Defendants consistently asserted their positions that there was no meeting of the minds about the settlement.

The court finds that (at least) the following are material terms to the settlement about which there was no mutual assent.[18]

- The term sheet provides that the "all properties will be picked by five children via lottery 1-5 then reverse pick 5-1." Given that the properties to be disposed of by lottery

---

[16] Additionally, the signature pages for Plaintiffs have different document identification numbers.

[17] While this may have simply been a mistake, it is not the court's responsibility to connect the dots of the settlement agreement that Plaintiffs contend was agreed to.

[18] If there was a failure of assent to even one material term, that is enough to deny enforcement of the settlement agreement.

15

are at the crux of this dispute, this is a material term. The term sheet provides no other procedures by which the lottery will be conducted. The settlement agreement however includes a detailed lottery process, to which Defendant Scott Wilson objects. His objection was raised in the August 11 email from his counsel of record at the time (Docket No. 115-3 at 3), and sufficiently evidences that there was no mutual assent to this material term.

- Releases and the scope of releases are material terms of a settlement. Even though the term sheet recites that the claims of the parties' mother "shall be compromised and settled," (Docket No. 115-3 at 5), the settlement agreement does not provide for a release of any claims she has against Defendant Scott Wilson. He raised this objection in the same August 11 email (Docket No. 115-3 at 3), which likewise evidences a lack of mutual assent as to this material term.

- The term sheet provides for Defendant Scott Wilson to repay the probate estate $121,132, and for Defendant John Wilson to reimburse Scott Wilson the amount of $43,350. (Docket 115-3 at 5). Given these amounts, the court finds these to be material terms. The settlement agreement includes additional provisions for these payments (Docket No. 115-3 at 10), which were not agreed to by Defendant Scott Wilson as evidenced by the August 11 email (Docket No. 115-3 at 3).[19]

---

[19] Plaintiffs implicitly argue that the inquiry begins and ends with the agreement of counsel to a final version of a settlement agreement. *See* Affidavit of Aubrey Brown, Docket No. 97-1 at ¶5 (referring to "final version" of settlement agreement). However, as noted, another final version of the settlement agreement different than the final version to which Plaintiffs' counsel, Mr. Brown, refers (at Docket No. 96-1) was later substituted. Also, the August 11 email from Defendant Scott Wilson's counsel objectively put the parties on sufficient notice of Defendants' belief that no settlement had been reached.

16

Case 3:15-cv-00520   Document 157   Filed 08/07/17   Page 16 of 19 PageID #: 2116

In sum, Plaintiffs ask the court to bind Defendants to a settlement agreement to which they never objectively manifested assent. The court cannot do so, and Plaintiffs' motion must therefore be denied.

Defendants also argue that court approval of the settlement with Defendant John Wilson is a material term to which there was no mutual assent. The court agrees. Plaintiffs do not dispute that there was no agreement for court approval of the settlement agreement with Defendant John Wilson. Plaintiffs simply argue that such court approval is not mandated. *See* Docket No. 149 at 4. However, even if court approval is not required, "if a conservator deems it necessary to change the character of property to meet the needs of the conservatee, the appropriate course of action is to seek court approval." *Grahl v. Davis*, 971 S.W.2d 373, 379 (Tenn. 1998) (citation omitted). In *Grahl*, the Tennessee Supreme Court addressed the critical fiduciary duties a conservator owes to a conservatee. Given the importance of protecting the interests of those who are incapable of protecting themselves, this court finds that provisions for the protection of Defendant John Wilson's interests are material to the settlement, and were not agreed to, as evidenced by the record. Plaintiffs' request to bind Defendants to an "agreement" without these material terms should be denied.

Regarding Plaintiffs' request for attorneys' fees and costs, this court has the inherent authority to sanction bad-faith conduct, as well as conduct that is tantamount to bad faith. *Metz v. Unizan Bank*, 655 F.3d 485, 489 (6th Cir. 2011) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991); *Ry. Express, Inc. v. Piper*, 447 U.S. 752, 767 (1980)); *see also First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 511-512 (6th Cir. 2002). Bad faith, in turn, is associated with conduct that is intentional or reckless. *See Schafer v. City of Defiance Police Dep't*, 529 F.3d 731, 737 (6th Cir. 2008); *United States v. Wheeler*, 154 F. Supp. 2d 1075, 1078 (E.D.

17

Mich. 2001); *accord Long v. Steepro*, 213 F.3d 983, 987 (7th Cir. 2000). However, the court cannot conclude from the record presented that Defendants acted in bad faith, or that their conduct was either intentional or reckless. To be sure, the lack of a settlement in this case has proved costly and will prolong this unfortunate dispute at added cost to all the parties. Nevertheless, the court cannot place the blame for that outcome entirely on Defendants.[20] For all of these reasons, Plaintiffs' request to enforce the settlement agreement and Plaintiffs' request for attorney's fees should be denied.

### RECOMMENDATION

Based on the foregoing, the undersigned Magistrate Judge respectfully recommends that:

1. Plaintiffs' Motion to Enforce Arbitration Order #2 (Docket No. 117) be DENIED as to the enforceability of an arbitration award and also DENIED, on different grounds, as to enforcement of the settlement agreement;

2. Plaintiffs' request for attorney's fees be DENIED; and,

2. the Motion of Defendant Bennett Gordon Scott Wilson to Vacate Arbitration Order #2 (Docket No. 140), and the Motion of Defendant John Bruce Wilson, Jr. to Vacate Arbitration Order #2 (Docket No. 145) be DENIED AS MOOT.

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this Report and Recommendation, and must state with particularity the specific portions of this Report and Recommendation to which objection is made. Any

---

[20] The court would hope that the parties can still fashion a settlement, so that the fate of the fictional Jarndyce family of Charles Dickens' *Bleak House* does not become the reality of the Wilson family.

party opposing said objections shall have fourteen (14) days after of service of any objections in which to file a response. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

          Respectfully submitted,

          _____
          BARBARA D. HOLMES
          United States Magistrate Judge